## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LOUIS YUDKOVITZ, | : | |
| | : | |
| Plaintiff, | : | Case No. 02-CV-3029 |
| | : | |
| v. | : | |
| | : | |
| BELL ATLANTIC CORPORATION, BELL | : | JUDGE LEGROME DAVIS |
| ATLANTIC NETWORK SERVICES, INC., | : | |
| VERIZON COMMUNICATIONS INC. and | : | |
| VERIZON SERVICES CORP. | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Defendants Bell Atlantic Corporation, Bell Atlantic Network Services, Inc., Verizon

Communications Inc. and Verizon Services Corp. (collectively "Verizon") present the Court with

the following well-supported reasons to grant summary judgment for Verizon and dismiss with

prejudice Plaintiff's First Amended Complaint in its entirety:

- **First**, with respect to Plaintiff's claim that Verizon failed to accommodate some purported disability by refusing to allow Plaintiff to work from home, Plaintiff's claim fails as a matter of law because (i) he did not have a covered disability; (ii) Plaintiff never requested an accommodation for any disability; and (iii) Plaintiff never requested any reasonable accommodation.

- **Second**, with respect to Plaintiff's claim that Verizon discriminated against Plaintiff on the basis of some purported disability when it terminated his employment, Plaintiff's claim fails as a matter of law because (i) Plaintiff was not "disabled," and (ii) Plaintiff cannot adduce evidence that Verizon's reasons for terminating him were a pretext for discrimination.

## I.    STATEMENT OF FACTS

### A.    Procedural History of the Case

On or about May 22, 2002, Plaintiff Louis Yudkovitz ("Plaintiff"), filed his Complaint alleging disability discrimination in violation of the Americans with Disabilities Act ("ADA") (Complaint, Count I) and violations of the Pennsylvania Wage Payment and Collection Law. (Complaint, Count II).  Plaintiff on November 4, 2002, filed a First Amended Complaint, which did not add any additional factual allegations, but added only an additional count alleging disability discrimination in violation of the Pennsylvania Human Relations Act.  (First Amended Complaint, Count III).  Discovery was completed and closed on February 22, 2003.  On or about March 12, 2003, the parties jointly filed a Stipulation to dismiss with prejudice Plaintiff's wage payment claim at Count II.  As a result, the only claims that remain before the Court are Plaintiff's disability discrimination claims contained at Counts I and III.

### B.    Plaintiff's Work History

Plaintiff states that, before working for Verizon, he was employed by, and/or performed independent contractor work for, at least 22 different companies over 31 years.  (Appendix,[1] Tab A, Plaintiff's Resume; Tab B, Plaintiff's Deposition at 26-97, 112-117, 127-128).  On June 1, 1999, Plaintiff commenced employment with Verizon, for whom Plaintiff worked until May 8, 2000, when Verizon terminated Plaintiff's employment for substandard performance.  (Tab A, Plaintiff's Resume; Tab B, Pl. Dep. at 156-157).  From May 8, 2000 until January 20, 2003, Plaintiff states that he was not employed by, nor did Plaintiff perform independent contractor work for, any entity.  (Tab B, Pl. Dep. at 157, 366-367).  On or about January 21, 2003, Plaintiff

---

[1] Copies of all evidentiary material and unpublished cases referenced herein are provided to the Court in the contemporaneously filed Appendix to Defendants' Brief in Support of Motion for Summary Judgment.

states that he commenced employment with the Internal Revenue Service.  (Tab B, Pl. Dep. at 157-159).

### C.    Plaintiff's Contends that He Suffers from Multiple Sclerosis

Plaintiff contends that he suffers from a form of multiple sclerosis that "is relapsing and recurring … it comes and then it goes."  (Tab B, Pl. Dep. at 102-103).  Plaintiff states that he suffers infrequent episodes of symptoms that, "all of a sudden, can disappear." (Tab B, Pl. Dep. at 103).  According to Plaintiff, when his multiple sclerosis is in a period of remission, he has few, if any, limitations:

> When the relapse disappears, it goes into remission. … So when it goes into remission, I actually come back to my normal self. … [T]here's no symptoms, there's nothing.  So once it goes back to that point, I can do anything."

(Tab B, Pl. Dep. at 106-107).

"[W]alking around the house is no problem, [nor is] walking on a flat surface," Plaintiff states.  (Tab B, Pl. Dep. at 109).  Outdoors, Plaintiff admits that he is able to walk, but is careful not to trip over uneven pavement.  (Tab B. Pl. Dep. at 109, 192-193).  Plaintiff states that, to date, he has never fallen while walking. (Tab B, Pl. Dep. at 110-111).  Other than having to be careful when walking, Plaintiff's only physical limitation is that he cannot "carry[] heavy objects."  (First Amended Complaint at ¶47).  Plaintiff states that he is limited by weakness in his left hand only, which causes him to "just lift so much" because potentially he "could end up dropping things."  (Tab B. Pl. Dep. at 193).  Plaintiff admits that, when working for Verizon, the multiple sclerosis from which he contends he suffers never affected his ability to perform his job. (Tab C, EEOC ADA Intake Questionnaire at Page 2; Tab B, Pl. Dep. at 196).

Plaintiff states that the first time that he can recall suffering any onset of symptoms relating to multiple sclerosis was in June 1997, when he experienced some weakness in his left

arm and dizziness.  (Tab B, Pl. Dep. at 101-102).  The next time that Plaintiff recalls symptoms

surfacing was almost one year later, sometime in the spring of 1998, when Plaintiff states he

again experienced left-side weakness and dizziness.  (Tab B, Pl. Dep. at 118-122).  "[W]ithin a

matter of another couple of weeks, everything subsided, disappeared."  (Tab B, Pl. Dep. at 122).

According to Plaintiff, a third episode of symptoms occurred in September 1998, when

Plaintiff states he experienced some dizziness one evening as he walked the steps in his home.

(Tab B, Pl. Dep. at 123-125).  Plaintiff admits that he did not miss any work from that episode

and, afterward, he "went through … quite a long period of time without any problems at all."

(Tab B, Pl. Dep. at 128-129).

### D.    Plaintiff Commences Employment with Verizon in June 1999

In the spring of 1999, Plaintiff was attempting to obtain employment through a recruiting

firm, Romac International ("Romac").  (Tab B, Pl. Dep. at 136-137).  At the same time, Verizon

was looking to hire someone who possessed software release management experience to work in

its Order Management Department.  (Tab E, Cass-Schmidt Dep. at 37).  The Order Management

Department developed, tested and rolled out new software applications and upgrades to existing

software applications.  (Tab B, Pl. Dep. at 257-258; Tab D, Brown Dep. at 99-101).  Plaintiff

states that, at this point in time, his health was fine (Tab B, Pl. Dep. at 147) and he did not tell

Romac that he suffered from multiple sclerosis or that he had any physical limitations.  (Tab B,

Pl. Dep. at 361).

Romac arranged a job interview for Plaintiff with Verizon for the Order Management

Department position.  (Tab B, Pl. Dep. at 140-141; Tab E, Cass-Schmidt Dep. at 12).  Plaintiff

interviewed with Betty Cass-Schmidt, who is Senior Manager in the Order Management

Department, and another manager, Mary Kivlin.  (Tab E, Cass-Schmidt Dep. at 6-8).  Ms. Cass-

Schmidt "explained to [Plaintiff] what he would be doing, where the need was within the

organization, and what was involved in that." (Tab E, Cass-Schmidt Dep. at 20). "[W]e explained that what we were looking for was someone to come in and to develop a release management process … ." (Tab E, Cass-Schmidt Dep. at 37). Plaintiff admits that he did not disclose during the interview that he had any health issues whatsoever. (Tab B, Pl. Dep. at 146, 361-362; Tab E, Cass-Schmidt Dep. at 15). "[I]t never came up," Plaintiff said. (Tab B, Pl. Dep. at 361). Verizon selected Plaintiff over "at least five, probably more" candidates (Tab E, Cass-Schmidt Dep. at 13), and hired Plaintiff without knowledge of any medical conditions that he may have had. (Tab B, Pl. Dep. at 361).

Plaintiff commenced employment with Verizon on June 1, 1999 in the position of Software Engineer, Level III in the Release Management Department with an annual salary of $67,000.00. (Tab B, Pl. Dep. at 252-253; Tab E, Cass-Schmidt Dep. at 15-16; Tab D, Brown Dep. at 16). Software Engineer, Level III is "a senior position. The expectation is that the person is going to be able to come in the door and be, in a very, very quick period of time, if not immediately, very, very productive." (Tab E, Cass-Schmidt Dep. at 16, 45-46). The only training that such an experienced hire would receive would be a company orientation session. (Tab E, Cass-Schmidt Dep. at 16, 45-46).

About three months into the job, in August or September 1999, Plaintiff states that he was assigned the task of taking minutes at weekly department meetings and distributing them to his co-workers before the next meeting. (Tab B, Pl. Dep. at 266). Taking minutes is "a critical function" that Ms. Cass-Schmidt had performed herself in the past. (Tab E, Cass-Schmidt Dep. at 34, 38). Plaintiff states that he was not able to generate meeting minutes in a timely fashion and "what ended up happening several times was the minutes were not ready to go out until the following week." (Tab B, Pl. Dep. at 268). When Plaintiff finally produced meeting minutes,

they were inaccurate, unclear and poorly organized. (Tab D, Brown Dep. at 50; Tab E, Cass-Schmidt Dep. at 40-42).

Plaintiff states that, in August 1999, he also was assigned the task of making an oral presentation on production support. (Tab B, Pl. Dep. at 277). Ms. Cass-Schmidt, who attended and listened to Plaintiff's presentation, "told me it was not a good presentation," Plaintiff said. (Tab B, Pl. Dep. at 279). "They told me that it was not complete, that it was not a good, solid presentation." (Tab B, Pl. Dep. at 280). Ms. Cass-Schmidt believed Plaintiff's presentation "was not factually correct … [and] poorly organized. … [T]he presentation was just so poorly done that I called a meeting to a halt so that we would not waste his time or our time … ." (Tab E, Cass-Schmidt Dep. at 36-37). Ms. Brown, who would become Plaintiff's direct supervisor in October 1999 (Tab D, Brown Dep. at 24), also attended Plaintiff's presentation and concluded that Plaintiff "had organizational deficiencies" and "did not have strong presentation skills." (Tab D, Brown Dep. at 29-30). Plaintiff admits that neither Ms. Brown nor Ms. Cass-Schmidt knew, at that time, that Plaintiff had any health issues. (Tab B, Pl. Dep. at 283-284). As a result of Plaintiff's poor presentation, and in an effort to help Plaintiff better understand his job, Ms. Cass-Schmidt assigned him to sit with employees who performed production support "so he could learn more about the applications and the processes." (Tab D, Brown Dep. at 49; Tab E, Cass-Schmidt Dep. at 57-58).

In November 1999, Plaintiff states that he experienced an episode of multiple sclerosis symptoms, now his fourth episode of symptoms in over two years, while walking through a shopping mall. (Tab B, Pl. Dep. at 204-205). When the November 1999 episode occurred, Plaintiff states that he called his then-immediate supervisor, Ms. Brown, to inform her that he would be off sick because -- as he admits he told Ms. Brown -- his "neurological disorder has

flared up." (Tab B, Pl. Dep. at 208). Plaintiff did not disclose any additional information about his physical condition or disclose that he suffered from multiple sclerosis. (Tab B, Pl. Dep. at 214).

In response, Plaintiff states that Ms. Brown instructed Plaintiff to contact CORE Inc., an independent third-party company that contracts with Verizon to confidentially administer family and medical leave and short-term disability leave. (Tab B, Pl. Dep. at 208-209; Tab D, Brown Dep. at 33-34). Plaintiff did contact CORE "frequently" and "kept [CORE] informed" during his absence. (Tab B, Pl. Dep. at 209). Plaintiff states that Ms. Brown never asked him about his health condition. (Tab B, Pl. Dep. at 208, 212-214). Meanwhile, CORE did not share with Verizon any information whatsoever about Plaintiff's health condition. (Tab D, Brown Dep. at 31-33). When Plaintiff reported to Ms. Brown in December 1999 that he was returning to work, Plaintiff admits that Ms. Brown did not ask Plaintiff anything about his health, and Plaintiff did not disclose any such information. (Tab B, Pl. Dep. at 213; Tab D, Brown Dep. at 35-36).

Ms Brown continued to supervise Plaintiff, and during the course of her supervision of Plaintiff, developed a number of concerns regarding his performance: First, she believed that "he had not shown an understanding of the applications and processes within our organization." (Tab D, Brown Dep. at 48). Ms. Brown also "was concerned about the accuracy and timeliness of documents that [Plaintiff] submitted[, … ] about his lack of PC skills and use of project management tools[, … ] about his inability to react to feedback[, and] the quantity of assignments that he could take on." (Tab D, Brown Dep. at 48).

### E.    Plaintiff's Performance is Rated Unsatisfactory

Verizon annually evaluates its employees during the first three months of a calendar year and, in early March 2000, consistent with that practice, Ms. Brown drafted her review of Plaintiff and rated his performance as unsatisfactory. (Tab F, Performance Evaluation). Ms. Cass-

Schmidt, who had hired Plaintiff only nine months earlier, reviewed a draft of Ms. Brown's appraisal of Plaintiff and agreed with Ms. Brown's assessment of Plaintiff's performance. (Tab E, Cass-Schmidt Dep. at 43, 49; Tab D, Brown Dep. at 67).

Any Verizon employee whose performance is rated below satisfactory level is placed on a Performance Improvement Plan, a structured plan to help them improve their performance. (Tab B, Pl. Dep. at 407-408; Tab E, Cass-Schmidt Dep. at 49)  Because Plaintiff's performance was rated unsatisfactory, Plaintiff was placed on a Performance Improvement Plan (Tab E, Cass-Schmidt Dep. at 43, 49), a written copy of which was given and explained to Plaintiff on March 13, 2000. (Tab G, Performance Improvement Plan). The Performance Improvement Plan notified Plaintiff that failure to rectify his performance deficiencies "could result in discipline up to and including dismissal." (Tab G, Performance Improvement Plan).

Plaintiff's Performance Improvement Plan required Plaintiff to satisfactorily complete two assignments by the end of March 2000 and pursue some computer training. Id. Plaintiff states that, while on the initial Performance Improvement Plan, Ms. Brown was meeting with him at least once a week. (Tab B, Pl. Dep. at 312; Tab D, Brown Dep. at 79). With respect to the training, Plaintiff completed Microsoft Excel training, but a Lotus Notes class that he was scheduled to take was cancelled. Plaintiff refused to travel to an alternative location, King of Prussia, to take the Lotus Notes class, so Ms. Brown authorized him to take it via the Internet. (Tab D, Brown Dep. at 69-70). As for the two assignments, Plaintiff completed the first only after "a great deal of guidance on [Ms. Brown's] part where [she] basically at one point met with him and used a white board and asked him questions[;] … [t]he amount of guidance that he needed to get there indicated a problem still." (Tab D,  Brown Dep. at 67-68). With regard to the second assignment, Plaintiff completed it "[a]gain, with a lot of guidance and a lot of

corrections." (Tab D, Brown Dep. at 69). Ms. Brown noticed "some improvement, although [Plaintiff] was not to the level where I thought he should be."

Although Plaintiff had not completed his two assignments satisfactorily, Ms. Brown exercised her discretion and extended Plaintiff's Performance Improvement Plan to determine whether "there were other tasks that [Plaintiff] would perform better." (Tab D, Brown Dep. at 76, 89). Ms. Brown drafted the extended Performance Plan on April 11, 2000. (Tab H, extended Performance Improvement Plan; Tab D, Brown Dep. at 78). On April 18, 2000, Ms. Brown provided Plaintiff with a copy of the extended Performance Plan, which consisted of three additional assignments to be completed by the end of April 2000. (Tab H, extended Performance Improvement Plan; Tab D, Brown Dep. at 78-79). Plaintiff performed one assignment unsatisfactorily, completed a second only after multiple feedback sessions with Ms. Brown and relied on incorrect documents in attempting to complete the third assignment. (Tab D, Brown Dep. at 77-78).

On April 17, 2000, during one of their frequent meetings, Plaintiff states that he asked Ms. Brown if there would be any consequences if he missed time from work. (Tab B, Pl. Dep. at 313-314). Plaintiff contends that Ms. Brown told him "it would probably be your job." (Tab B, Pl. Dep. at 314). Plaintiff states that, in response, he disclosed for the first time, without solicitation, that "my neurological disorder was actually multiple sclerosis." (Tab B, Pl. Dep. at 214, 301; Tab D, Brown Dep. at 37-38; Tab E, Cass-Schmidt Dep. at 51-52). In response, Ms. Brown said, "[n]othing. She thanked me for telling her and that was it," Plaintiff said. (Tab B, Pl. Dep. at 315).

During the original and extended Performance Improvement Plans, Ms. Cass-Schmidt "met with [Plaintiff] and Rosemary [Brown], and on more than one occasion, and said is there

anything that you need, is there anything that is not happening that will allow you to -- that is preventing you from completing this work … .  And the answer that I got back on more than one occasion was that Rosemary is being very helpful.  There is nothing that was lacking."  (Tab E, Cass-Schmidt Dep. at 51).  Plaintiff never indicated that any health issues were precluding him from completing his assignments.  (Tab E, Cass-Schmidt Dep. at 58).

In late April, in light of Plaintiff's ongoing performance problems, Ms. Brown recommended to Ms. Cass-Schmidt on April 27 or April 28 that Verizon terminate Plaintiff's employment.  (Tab D,  Brown Dep. at 90; Tab E, Cass-Schmidt Dep. at 53).

On May 1, according to Plaintiff, he suffered another episode of symptoms in which he had "difficulty walking, balance off."  (Tab B, Pl. Dep. at 440-441).  Plaintiff was absent from work from May 2 through May 4, which delayed Verizon's notification to him that his employment was being terminated for poor performance.  (Tab B, Pl. Dep. at 441-445; Tab D, Brown Dep. at 91-92).  Plaintiff reported to work on Friday, May 5, 2000 and on Monday May 8, 2000, on which date Plaintiff was notified that his employment was terminated for performance reasons.  (Tab B, Pl. Dep. at 442-443).

F.     **Plaintiff's Request to Work From Home**

In the Order Management Department at Verizon, employees who were assigned to cover system "testing" during evening or weekend hours were permitted to work from home.  (Tab B, Pl. Dep. at 232-233, 288-289; Tab E, Cass-Schmidt Dep. at 26-27).  Other employees who required minimal supervision and displayed satisfactory job performance and self-sufficiency could agree with their manager to "telecommute" during the regular work day on agreed-upon days, not exceeding three per week.  (Tab E, Cass-Schmidt Dep. at 26-27; Tab J, General Telecommuting Guidelines at pp. 15, 25).  Individuals who were on a Performance Improvement Plan were not permitted to work from home, except if they had, by chance, been scheduled to

work an off-hours shift.  (Tab E, Cass-Schmidt Dep. at 28).  Generally, however, individuals on

a Performance Improvement Plan were not assigned off-hours shifts.  (Tab E, Cass-Schmidt Dep.

at 30).

      Plaintiff states that he requested to be able to work exclusively from home "as early as

July [1999], right after I first started … even before the MS attacks occurred" and before Plaintiff

had ever indicated to anyone at Verizon that he suffered from a "neurological disorder" or, more

specifically, multiple sclerosis.  (Tab B, Pl. Dep. at 222, 266-267, 284-285).  Plaintiff first asked

Michael DiTomasso, Plaintiff's manager when Plaintiff first started with Verizon, if he could

work from home.  According to Plaintiff, Mr. DiTomasso told Plaintiff he did not know how an

employee can arrange to work from home.  (Tab B, Pl. Dep. at 285).  Plaintiff next asked Mary

Kivlin, a manager who provided Plaintiff with names of individuals (whose names Plaintiff

cannot recall) who might be able to help Plaintiff arrange at-home computer access, which would

partially give him the capability to work from home.  (Tab B, Pl. Dep. at 285).

      Next, in October 1999, Plaintiff approached Ms. Cass-Schmidt for the first time and

requested that he be permitted to work from home.  (Tab B, Pl. Dep. at 231-232; see also Tab E,

Cass-Schmidt Dep. at 25).  Plaintiff explained at his deposition that the reasons he wanted to

work from home were because "my wife had to drive me into work and then pick me up.

Another reason was that … it was not that easy for me … getting back and forth to the train

station."  (Tab B, Pl. Dep. at 222, 427-428).  In furtherance of his desire to work from home,

Plaintiff states that he filled out and submitted to Ms. Cass-Schmidt a Telecommuting

Commitment form, in which Plaintiff wrote that working from home would provide him with

"instant communications without the need for public transportation."  (Tab B, Pl. Dep. at 229-

234; Tab I, Telecommuting Commitment).  Plaintiff made no reference to any health issues when

he filled out the Telecommuting Commitment form.  (Tab B, Pl. Dep. at 229-234; Tab I,

Telecommuting Commitment).  Plaintiff admits that Ms. Cass-Schmidt approved Plaintiff's

request for at-home computer access sometime before November 1999 so that he could work

from home during off-hours shifts.  (Tab I, Telecommuting Commitment; Tab B, Pl. Dep. at

230-234, 238, 296-297; Tab E, Cass-Schmidt Dep. at 25-26; Brown Dep. at 43).

    According to Plaintiff, a Verizon technician appeared at Plaintiff's home "to set up the at-

home accessibility for me."  (Tab B, Pl. Dep. at 223-224).  Verizon installed for Plaintiff an extra

telephone line at his home.  (Tab B, Pl. Dep. at 298-299).  After the telephone line was set up by

the technician, Plaintiff requested assistance in getting his personal computer programmed to

access Verizon's computer network.  Plaintiff's supervisor, Ms. Brown, took the unprecedented

step of permitting Plaintiff and a computer-literate co-worker to leave work early, proceed to

Plaintiff's home, and attempt to set up Plaintiff's computer for at-home access.  (Tab B, Pl. Dep.

at 224-226; Tab E, Cass-Schmidt Dep. at 31; Tab D, Brown Dep. at 42-43).  Plaintiff states that

the co-worker, Tim Monaghan, could not link Plaintiff's computer with Verizon's computer

system because Plaintiff's personal computer did not have sufficient memory to run the software

necessary to access Bell Atlantic's network from Plaintiff's home.  (Tab B, Pl. Dep. at 225; Tab

D, Brown Dep. at 43).  Despite that fact that Verizon installed a telephone line and sent a

computer-literate co-worker to Plaintiff's house to assist him, Plaintiff never successfully linked

to Verizon's computer system.  (Tab B, Pl. Dep. at 299).

## II.    ARGUMENT

### A.    Summary Judgment Standard

    Summary judgment must be granted "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact."  Fed. R. Civ. P. 56(c); see also Orson, Inc. v. Miramax

Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996). An issue is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the evidence is "merely colorable" or is "not significantly probative," summary judgment should be granted. Id. at 249-50. In making its determination, the court is permitted to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Electric Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986). If, after adequate time for discovery, a party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,]" then "the plain language of Rule 56(c) mandates the entry of summary judgment." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Fuentes v. Perskie, 32 F.3d 759, 762 n.1 (3d Cir. 1994) (to survive summary judgment motion, non-moving party must point to "sufficient cognizable evidence to create material issues of fact concerning every element as to which the nonmoving party will bear the burden of proof at trial"); accord, Poyner v. Good Shepherd Rehab, 202 F.Supp.2d 378, 381 (E.D. Pa. 2002).

Because Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts (i.e., Title VII, ADA, and ADEA) and because Plaintiff has not alleged any unique state law matter with regard to his PHRA claim, Plaintiff's ADA and PHRA claims should be treated as coextensive for purposes of summary judgment. See Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996) (stating that it was proper for district court to treat plaintiff's PHRA claims as coextensive with his ADA claim).

### B.    The Court Should Dismiss Plaintiff's Claim that Verizon Failed to Reasonably Accommodate Some Purported Disability

Plaintiff claims that Verizon allegedly violated the ADA and PHRA when it "denied [Plaintiff's] repeated requests for the accommodation of working at home." (Tab B, First

Amended Complaint at ¶38). First, Plaintiff's claim fails because the duty of accommodation arises only if the employee is determined to have an ADA-covered disability. See, e.g., Buskirk v. Apollo Metals, 307 F.3d 160, 169, n. 2 (3d Cir. 2002).[2] Here, Plaintiff does not have an ADA-covered disability.

Second, Plaintiff never requested an accommodation for a disability. Because Verizon never knew "of both [any purported] disability and desire for an accommodation," Verizon had no duty to provide an accommodation. See Taylor v. Phoenixville School District, 184 F.3d 296, 313 (3d Cir. 1999). Third, even if Plaintiff did have an ADA-covered disability, and had requested an accommodation for a disability, Verizon was not required to permit him, as an accommodation, to exclusively work from home because it was inconvenient for Plaintiff to travel to and from work. Stanley v. Lester M. Prange, Inc., 25 F.Supp.2d 581 (E.D. Pa. 1998) (Kelly, J.); Laresca v. AT&T, 161 F.Supp.2d 323, 334 (D. N.J. 2001).

1.      **Plaintiff Does Not Suffer From an ADA-Covered Disability**

Plaintiff's reasonable accommodation claim fails because he did not have an ADA-covered disability. The United States Supreme Court has stated that "[m]erely having an impairment does not make one disabled for purposes of the ADA." Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 195 (2002). Rather, an ADA-covered disability is an impairment that substantially limits a person in engaging in one of the major activities of life. Bragdon v. Abbott, 524 U.S. 624, 639 (1998). Each case requires an individualized assessment

---

[2] Accord, Hoffman v. Caterpillar, Inc., 256 F.3d 568, 572 (7th Cir. 2001); Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 563 (7th Cir. 1996); Gelabert-Ladenheim v. American Airlines, Inc., 252 F.3d 54, 59 and n. 5 (1st Cir. 2001); Swain v. Hillsborough County School Board, 146 F.3d 855, 858 (11th Cir. 1998).

of whether an impairment limits an individual's major life activities and, if so, to what degree. Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 783-85 (3d Cir. 1998).[3]

In conducting the individualize assessment, a court must determine whether a plaintiff "is 'unable to perform a major life activity that the average person in the general population can perform' or is 'significantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.'" Kelly, 94 F.3d at 105 (quoting 29 C.F.R. § 1630.2(j)).

Applying the individualized test, courts have determined that employees diagnosed with multiple sclerosis in many cases do not suffer from an ADA-covered disability because they are not limited in any major life activities. See, e.g., McCoy v. USF Dugan, Inc., No. 01-3189, 2002 WL 1435908, at *3 (10th Cir. July 3, 2002) (copy attached at Tab 1) (plaintiff with multiple sclerosis that allegedly limited her ability to walk and to lift failed to make *prima facie* case that she was disabled under ADA); Sorensen v. University of Utah Hosp., 194 F.3d 1084, 1087 (10th Cir. 1999) (holding that plaintiff's multiple sclerosis symptoms affected plaintiff for only a brief period of time and, therefore, plaintiff was not disabled under ADA); Vandeveer v. Fort James Corp., 192 F. Supp. 2d 918, 934 (E.D. Wis. 2002) (holding that plaintiff was not disabled under ADA despite diagnosis of multiple sclerosis).

More specifically, courts that have encountered plaintiffs with multiple sclerosis and whose symptoms intermittently come and go episodically have determined that these individuals are "impaired but not disabled" within the meaning of the ADA. See Wynn v. Whitney Holding Corp., 220 F.Supp 2d 582 (M.D. La. 2002). In Wynn, the district court found an employee who

---

[3] See also 29 C.F.R. § 1630.2(j) App. at 349 ("determination of whether an individual has a disability *is not necessarily based on the name or diagnosis of the impairment the person has*, but rather on the effect of that

suffered from multiple sclerosis prone to "relapses and remission" was not substantially limited in any major life activities.  Id. at 589-90.  Similarly, in McCoy, the Tenth Circuit held that a plaintiff whose MS symptoms occurred during "flare-up[s]" was not substantially limited in any major life activities.  Three years earlier, the Tenth Circuit held in Sorensen that "[b]ecause [p]laintiff's hospitalization and MS symptoms affected her for only a brief period of time and do not presently impact her ability to perform the job, [p]laintiff did not suffer an impairment that substantially limits a major life activity under the ADA."  Sorensen, 194 F.3d at 1087.

In Plaintiff's case, he testified that he suffers, like the plaintiffs in Wynn, McCoy and Sorensen), from a form of multiple sclerosis that "comes and then it goes."  (Tab B, Pl. Dep. at 102-103).  According to Plaintiff, outside of infrequent episodes, "I actually come back to my normal self. … [T[here's no symptoms, there's nothing.  So once it goes back to that point, I can do anything."  (Tab B, Pl. Dep. at 106-107).

Indeed, Plaintiff states that when he experienced an episode in the spring of 1998, "within a matter of another couple of weeks, everything subsided, disappeared."  (Tab B, Pl. Dep. at 122).  Plaintiff states that after he experienced a relapse again in September 1998, he "went through … quite a long period of time without any problems at all."  (Tab B, Pl. Dep. at 128-129).  When working for Verizon, Plaintiff's multiple sclerosis never affected his ability to perform his job.  (Tab C, EEOC ADA Intake Questionnaire at Page 2;  Tab B, Pl. Dep. at 196).

Despite the fact that Plaintiff's symptoms come and go, and that his relapses number only five that are spread out over a five-year period, Plaintiff nevertheless claims that he is disabled because of purported limitations in the major life activities of walking and "carrying heavy objects."  (First Amended Complaint at ¶47).  With respect to walking, "moderate restrictions on

(continued…)

impairment on the life of the individual")

the ability to walk do not amount to substantial limitation."  See McCoy, 2002 WL 1435908 at

*3 (employee with multiple sclerosis not substantially limited in ability to walk).  In Plaintiff's

case, he admits that he has never fallen and that "walking around the house is no problem, [nor

is] walking on a flat surface."  (Tab B, Pl. Dep. at 109).  Outdoors, Plaintiff is able to walk, albeit

careful to not stumble over uneven pavement.  (Tab B. Pl. Dep. at 109, 192-193).  These

"moderate restrictions on the ability to walk do not amount to substantial limitation" under the

ADA.  See McCoy, 2002 WL 1435908 at *3.

With respect to "carrying heavy objects," the "inability to lift heavy objects does not

constitute a substantial limitation on a person's overall ability to lift [as the] capacity to perform

heavy lifting is not a trait shared by the majority of the population."  McCoy, 2002 WL 1435908

at *3 (quoting Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 21 (1st Cir. 2002); see also

Ray v. Glidden Co., 85 F.3d 227, 229 (5th Cir.1996) (the "inability to perform heavy lifting does

not render a person substantially limited").  Plaintiff's purported inability to carry heavy objects

"does not constitute a substantial limitation ... ." McCoy, 2002 WL 1435908 at *3.

In sum, Plaintiff  "did not suffer an impairment that substantially limits a major life

activity under the ADA."  Sorensen, 194 F.3d at 1087, accord, McCoy, 2002 WL 1435908 at *3;

Vandeveer, 192 F. Supp. 2d at 934.  As a result, Plaintiff was not disabled under the ADA and

Verizon had no duty to provide any accommodation.  See, Hoffman, 256 F.3d at  572; Bombard,

92 F.3d at 563; Gelabert-Ladenheim, 252 F.3d at 59 and n. 5;  Swain, 146 F.3d at 858.

### 2.    Plaintiff Never Requested a Disability Accommodation

Even if Plaintiff was "disabled," his reasonable accommodation claim still fails because

Plaintiff did not relate his requests to work from home to any health issue; rather his request was

exclusively and solely related to a commuting problem.  "[W]hat matters under the ADA [is]

whether the employee or a representative for the employee provides the employer with enough

information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." Taylor, 184 F.3d at 313 (3d Cir. 1999)."); see also Vandeveer, 192 F.Supp.2d at 933 (holding in multiple sclerosis case that "no accommodation is required … if the employer is unaware of the employee's workplace limitations").[4]  Here, Plaintiff freely admits that his multiple sclerosis never affected his ability to perform his job, that he never disclosed that he suffered from multiple sclerosis until April 17, 2000, and he had requested to be permitted to work from home "before [any] MS attacks occurred."  (Tab B, Pl. Dep. at 196, 214, 222, 266-267, 284-285, 301; Tab E, EEOC ADA Intake Questionnaire at Page 2).  Thus, Plaintiff did not, and there was no reason for him to, relate his request to work from home to any health issue.  Indeed, when Plaintiff filled out the Telecommuting Commitment form and submitted it to Ms. Cass-Schmidt for approval, he made no mention whatsoever of multiple sclerosis or any health issues.  (Tab I, Telecommuting Commitment).  Verizon never knew "of both [any purported] disability and desire for an accommodation." See Taylor, 184 F.3d at 313.  As a result, "no accommodation [wa]s required … [because] the employer [wa]s unaware of [any] workplace limitations." Vandeveer, 192 F.Supp.2d at 933.

> ### 3.    To the Extent that Plaintiff Requested A Disability Accommodation, it was Unreasonable

Even if Plaintiff suffered from an ADA-covered disability, and had requested an disability accommodation, his reasonable accommodation claim still fails because the work-at-home accommodation he requested was not reasonable.  In Stanley, Judge Kelly held that an employee's request to work from home was not reasonable under the ADA because "solitary unsupervised work … generally cannot be performed at home without a substantial reduction in the quality of the employee's performance." Stanley, 25 F.Supp.2d at 584 (internal quotations

---

[4]  See also 29 C.F.R. Pt. 1630.9, App. (stating that "[i]n general ... it is the responsibility of the individual

omitted); <u>see</u> <u>also</u> <u>Vande Zande v. Wis. Dep't of Admin.</u>, 44 F.3d 538, 544-45 (7th Cir. 1995)

("an employer is not required to accommodate a disability by allowing the disabled worker to

work, by himself, without supervision, at home.... [and] it would take a very extraordinary case

for the employee to be able to create a triable issue of the employer's failure to allow the

employee to work at home"); <u>Tyndall v. National Education Centers</u>, 31 F.3d 209, 213-14 (4th

Cir. 1994) (holding that allowing plaintiff to work at home was not a reasonable

accommodation).

　　According to Plaintiff, he sought to work from home because it was inconvenient for him

to travel to and from work. (Tab B, Pl. Dep. at 222, 427-428).  Furthermore, Plaintiff admits that

he requested to be able to work from home "as early as July [1999], right after I first started

[working for Verizon] … even before [any] MS attacks occurred."   (Tab B, Pl. Dep. at 222, 266-

267, 284-285). Plaintiff made no requests for any special treatment within the workplace (Tab B,

Pl. Dep. at 461) because, while employed by Verizon, Plaintiff's multiple sclerosis never affected

his ability to perform his job.  (Tab C, EEOC ADA Intake Questionnaire at Page 2;  Tab B, Pl.

Dep. at 196).

　　Plaintiff's own testimony leaves him unable to demonstrate that his is "a very

extraordinary case [in which Plaintiff can] create a triable issue of the employer's failure to allow

the employee to work at home."  <u>Vande Zande</u>, 44 F.3d at 544-45.  Rather, Plaintiff's request to

work at home is unreasonable because "solitary unsupervised work … generally cannot be

performed at home without a substantial reduction in the quality of the employee's performance."

<u>Stanley</u>, 25 F.Supp.2d at 584; <u>accord</u>, <u>Tyndall</u>, 31 F.3d at 213-14.

---

(continued…)

with the disability to inform the employer than an accommodation is needed")

Furthermore, Plaintiff's desire to work from home related to a commuting inconvenience, [which Verizon] was not legally obligated to accommodate." Laresca, 161 F.Supp.2d at 334.  In Laresca, a federal district court in New Jersey held that when an employee seeks some special treatment relating to "a commuting problem, [the employer] was not legally obligated to accommodate."  In Laresca, the epileptic plaintiff suffered from seizures that prevented him from driving to and from work.  Although the case alleged violations of the New Jersey Law Against Discrimination, a dearth of state case law caused the federal district court to appropriately rely on ADA cases when it determined that "commuting to and from work is not part of the work environment that an employer is required to reasonably accommodate." Id. at 333.[5]

Plaintiff stated at his deposition that the reasons why he wanted to work from home were because of the inconvenience he experienced getting to and from work.  (Tab B, Pl. Dep. at 222, 427-428).  Verizon was not required to accommodate "an employee [such as Plaintiff] whose [purported] disability makes it difficult for that employee to use public or private means of transportation." See Schneider, 1996 U.S. Dist. LEXIS 19631; accord, Salmon, 4 F.Supp.2d 1157 at 1163; Bull, 2000 WL 224807 at *9.

In light of the foregoing facts and legal authority, the Court should dismiss with prejudice Plaintiff's claim that Verizon discriminated against Plaintiff on the basis of some purported disability when it denied Plaintiff's request to work from home.

---

[5] See also Bull v. Coyner, No. 98 C 7583, 2000 WL 224807 (N.D. Ill. Feb.23, 2000) (copy attached at Tab 2) (commuting to and from work falls outside scope of job and is not within scope of an employer's ADA obligations); Salmon v. Dade County School Board, 4 F.Supp.2d 1157, 1163 (S.D. Fla. 1998) (commuting to and from work is activity "unrelated to and outside the job" and ADA did not require an employer "to eliminate those barriers which exist outside the work environment"); Schneider v. Continental Casualty Co., 1996 U.S. Dist. LEXIS 19631 (N.D. Ill. Dec. 16, 1996) ("employer would not be required to provide … reasonable accommodation for an employee whose disability makes it difficult for that employee to use public or private means of transportation") (copy attached at Tab 3).

**C.**      **The Court Should Dismiss Plaintiff's Discriminatory Termination Claim**

In ADA cases alleging discriminatory termination, the Third Circuit applies the familiar

burden-shifting framework first established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792

(1973).  <u>See</u> <u>Shaner v. Synthes</u>, 204 F.3d 494, 500 (3d Cir. 2000); <u>Walton v. Mental Health Ass'n</u>

<u>of Southeastern Pa.</u>, 168 F.3d 661, 667-68 (3d Cir. 1999); <u>Newman v. GHS Osteopathic, Inc.</u>, 60

F.3d 153, 156-58 (3d Cir. 1995).  Under this framework:

> First, the plaintiff must establish a <u>prima facie</u> case of
> discrimination.  If the plaintiff succeeds in establishing a <u>prima</u>
> <u>facie</u> case, the burden shifts to the defendant "to articulate some
> legitimate, nondiscriminatory reason for the employee's rejection."
> Finally, should the defendant carry this burden, the plaintiff then
> must have an opportunity to prove by a preponderance of the
> evidence that the legitimate reasons offered by the defendant were
> not its true reasons, but were a pretext for discrimination.

<u>Jones v. School Dist. of Philadelphia</u>, 198 F.3d 403, 410 (3d Cir. 1999) (citations omitted).

**1.**      **Plaintiff Cannot Establish A Prima Facie**
          **Case Of Disability Discrimination**

In order to establish a <u>prima facie</u> case of individual disparate treatment under the ADA,

a plaintiff must show that (i) he is a disabled person within the meaning of the ADA; (ii) he is

otherwise qualified to perform the essential functions of the job, with or without reasonable

accommodation; and (iii) he has suffered an otherwise adverse employment decision.  <u>See</u>

<u>Shaner</u>, 204 F.3d at 500; <u>Gaul v. Lucent Techs., Inc.</u>, 134 F.3d 576, 580 (3d Cir. 1998); <u>Deane v.</u>

<u>Pocono Med. Ctr.</u>, 142 F.3d 138, 142 (3d Cir. 1998) (en banc) (citing <u>Gaul</u>).

To meet the definition of "disabled" under the ADA, a plaintiff must demonstrate that (i)

he is substantially limited in a major life activity; (ii) that he had a record of impairment; or (iii)

that his employer regarded him as having such an impairment.  42 U.S.C. § 12102(2).

a.      **Plaintiff is not "Disabled" Within**
**The Meaning Of The ADA**

Plaintiff is not "disabled" as is defined by the ADA.  As Verizon demonstrated in Section II.B.1, *supra*, Plaintiff's impairment consisted of infrequent, episodes of symptoms -- five over a five-year period -- that did not limit him in any major life activity and, as a result, did not constitute an ADA-covered disability.  See pages 14-17, *supra*.

Second, with respect to Plaintiff's claim that he had a "record" of impairment, "it is insufficient to merely submit evidence of a medical diagnosis of an impairment."  Grillasca-Pietri v. Portorican American Broadcasting Co., Inc., 233 F.Supp.2d 258, 262 (D. P.R. 2002).  Instead, Plaintiff must show he had a record -- on which his employer relied -- of an impairment that substantially limited a major life activity.  Olson v. General Electric Astrospace, 101 F.3d 947, 953 (3d Cir. 1996); see also Kresge v. Circuitek, 958 F.Supp. 223, 225 (E.D. Pa. 1997) ("plaintiff's impairment must be substantially limiting in order for his past records to be a 'record of such an impairment'"), accord, Vandeveer, 192 F.Supp.2d at 937 (multiple sclerosis case).

In Plaintiff's case, Verizon had no record of impairment upon which it could have relied.  Rather, Plaintiff states that his infrequent episodes of multiple sclerosis symptoms never affected his ability to perform his job at Verizon.  (Tab C, EEOC ADA Intake Questionnaire at Page 2; Tab B, Pl. Dep. at 196).  When Plaintiff interviewed for the job with Verizon, he did not disclose that he had any health issues.  (Tab B, Pl. Dep. at 146, 361-362;  Tab E, Cass-Schmidt Dep. at 15).  When Plaintiff sought permission to work from home, he never discussed multiple sclerosis or health issues.  (Tab B, Pl. Dep. at 231-232; Cass-Schmidt Dep. at 25; Tab I, Telecommuting Commitment).  When Plaintiff missed work due to an episode of symptoms in November and December of 1999, he did not disclose to Verizon that he suffered from multiple sclerosis or relate any details about his symptoms.  (Tab B, Pl. Dep. at 214).  CORE, which communicated

with Plaintiff during the episode, did not provide any information to Verizon about Plaintiff's health.  (Tab D, Brown Dep. at 31-33).

The first time that Plaintiff ever disclosed <u>any</u> detail to Verizon about his health condition was on April 17, 2000, more than one month after Verizon rated Plaintiff as not meeting its performance expectations and placed him on a Performance Improvement Plan.  (Tab B, Pl. Dep. at 214; Tab D, Brown Dep. at 37-38; Tab E, Cass-Schmidt Dep. at 51-52).  Even then, Plaintiff did not disclose details about his symptoms.  (Tab B, Pl. Dep. at 315).  The record evidence demonstrates that Plaintiff cannot show that he had a record -- on which his employer relied -- of impairment that substantially limited a major life activity.  <u>See</u> <u>Olson</u>, 101 F.3d at 953; <u>Kresge</u>, 958 F.Supp. at 225.

Third, with respect to Plaintiff's claim that he was "regarded as" disabled, the Supreme Court has stated that "[t]here are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.  In both cases, it is necessary that a covered entity entertain misperceptions about the individual -- it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting."  <u>Sutton v. United Air Lines, Inc.</u>, 547 U.S. 471, 489 (1999); <u>accord</u>, <u>Murphy v. UPS, Inc.</u> 527 U.S. 516 (1999).

In Plaintiff's case, there is no record evidence that Verizon "mistakenly believe[d] that [Plaintiff had] a physical impairment that substantially limits one or more major life activities," <u>Sutton</u>, 547 U.S. at 489, nor is there record evidence demonstrating that Verizon "mistakenly

believe[d] that an actual, nonlimiting impairment substantially limits one or more major life activities." Id. Rather, Verizon criticized and warned Plaintiff about his performance long before Plaintiff ever disclosed to Verizon that he suffered from multiple sclerosis.

Plaintiff cannot demonstrate that he was "disabled," and his claim for discriminatory termination on the basis of disability should be dismissed with prejudice.

### 2. Verizon Has Articulated a Legitimate Nondiscriminatory Reason for Terminating Plaintiff

Even if Plaintiff was able to establish a *prima facie* case of discrimination, Verizon has articulated a legitimate nondiscriminatory reason for terminating Plaintiff.[6]  The record evidence clearly establishes that Plaintiff's managers perceived his work to be deficient and were critical of Plaintiff's performance beginning at least nine months before his termination, and articulated their concerns to him both orally and in writing, long before they knew that Plaintiff had multiple sclerosis.  (Tab B, Pl. Dep. at 266, 268, 277, 279, 283-284; Tab D, Brown Dep. at 29-30, 50; Tab E, Cass-Schmidt Dep. at 34-38, 40-42; Tab F, Performance Evaluation; Tab G, Performance Improvement Plan).  When Plaintiff did not show sufficient improvement, his managers decided to terminate his employment for substandard performance.

Even though Plaintiff disagrees with his managers' perceptions and criticism, he "cannot substitute h[is] judgment … for that of his supervisors.  Nothing in the ADA permits this sort of usurpation of power."  See Vandeveer, 192 F.Supp.2d at 941 (dismissing ADA claim of plaintiff who suffered from multiple sclerosis); Selenke v. Medical Imaging of Colorado, 238 F.3d 1249, 1266 (10th Cir 2001) (declining in ADA case to "act as a super personnel department that second guesses employer's business judgments").

---

[6] This burden is one of production, not persuasion; it "can involve no credibility assessment."  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509  (1993).

3.    **Verizon's Reasons For Terminating Plaintiff's Employment Were Not Pretextual**

The Court should grant summary judgment for Verizon and dismiss Plaintiff's discriminatory discharge claim because there is no evidence that Plaintiff's purported disability motivated Verizon to terminate his employment.  Under McDonnell-Douglas, while the burden of production shifts to the employer to offer a legitimate nondiscriminatory reason for the adverse employment action, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).  With respect to the pretext question, "[a]t this point, the court focuses on whether there is sufficient evidence from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a pretext for intentional [disability] discrimination." Shaner, 204 F.3d at 500.

In a disparate treatment case, such as this one, "(p)roof of discriminatory motive is critical." Hazen Paper Co. v. Biggins, 506 U.S. 604, 609 (1993); International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977); see also Rio v. Runyan, 972 F.Supp. 1446, 1461 (S.D. Fla. 1997) (applying Teamsters proof of discriminatory motive requirement to ADA case); Krauel v. Iowa Methodist Medical Center, 915 F.Supp. 102, (S.D. Iowa  1995) (same), aff'd, 95 F.3d 674 (1996).  Consistent with the requirement that discriminatory motive exist, courts have stated that "the ADA 'cannot protect ... employees from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated.'" Armstrong v. Turner Industries, Inc., 141 F.3d 554, 560 n.16 (5th Cir. 1998); see also Allen v. Rapides Parish School Board, 204 F.3d 619, 623 (5th Cir. 2000) ("[t]he ADA gives [ ] a claim only for discriminatory action and not for unfair treatment").  "Without evidence to demonstrate

that [an employer] discriminated against [an employee by taking adverse action] on the basis of

his disability, [the employee] fails to satisfy his burden to overcome summary judgment."  Allen,

id.

In Plaintiff's case, the undisputed record evidence establishes the following:

- When Plaintiff interviewed with Verizon in the spring of 1999, he presented himself as an experienced project manager who had worked for 22 different companies over 31 years, causing Verizon to hire him over five other individuals into the position of Software Engineer Level III at an annual salary of $67,000.00.  (Tab E, Cass-Schmidt Dep. at 13; see also Tab B, Pl. Dep. at 147).

- As a Software Engineer Level III, Plaintiff was expected "to come in the door and be, in a very, very quick period of time, if not immediately, very, very productive."  (Tab E, Cass-Schmidt Dep. at 16, 45-46).

- Despite hopes that Plaintiff would hit the ground running, he struggled.  When Plaintiff was directed to take minutes at weekly department meetings and distribute them to his co-workers, he rarely made deadlines and "was not able to capture the action items accurately."  (Tab B, Pl. Dep. at 266, 268; Tab E, Cass-Schmidt Dep. at 38, 40-41).

- When Plaintiff was asked to give an oral presentation to managers, "[t]he presentation was just so poorly done that [Ms. Cass-Schmidt] called the meeting to a halt so that we would not waste his time or our time … ."  (Tab E, Cass-Schmidt Dep. at 36-37).

- Ms. Brown, who supervised Plaintiff from October 1999 until his termination, found that Plaintiff missed deadlines, produced inaccurate documents, lacked basic computer skills, did not respond to feedback and could not handle multiple assignments at one time.  (Tab D, Brown Dep. at 48).

- In March 2000, Ms. Brown recounted the deficiencies she had observed and rated Plaintiff as not meeting Verizon's performance expectations.  At the same time, Verizon place Plaintiff on a Performance Improvement Plan.  (Tab G, Performance Improvement Plan).

- Ms. Brown "had serious concerns even at the end of March given his performance on the initial performance improvement plan."  (Tab D,  Brown Dep. at 76, 89).

- On April 11, 2000, Ms. Brown drafted an extension of Plaintiff's Performance Plan that would include three additional assignments to determine if Plaintiff

could display any skills.  (Tab H, extended Performance Improvement Plan; Tab D, Brown Dep. at 315).  On April 18, 2000, Ms. Brown extended Plaintiff's Performance Improvement Plan and gave him the additional assignments.  (Tab H, extended Performance Improvement Plan; Tab  F, Brown Dep. at 78-79).

- Without solicitation, Plaintiff on April 17, 2000 stated to Ms. Brown that he suffered from multiple sclerosis. (Tab B, Pl. Dep. at 214, 301; Tab D, Brown Dep. at 37-38; Tab E, Cass-Schmidt Dep. at 51-52).

- On or about April 27 or April 28, having observed little improvement from Plaintiff, Ms. Brown recommended that Plaintiff's employment be terminated for performance deficiencies.  (Tab D, Brown Dep. at 89-91; Tab E, Cass-Schmidt Dep. at 53).

As the record evidence demonstrates, the concerns about Plaintiff's skills, and criticism of his performance, commenced months before Plaintiff voluntarily disclosed that he suffered from multiple sclerosis.  (Tab B, Pl. Dep. at 266, 268, 277, 279, 283-284; Tab D, Brown Dep. at 29-30, 50; Tab E, Cass-Schmidt Dep. at 34-38, 40-42; Tab F, Performance Evaluation; Tab G, Performance Improvement Plan).  Additionally, there is no record evidence that Plaintiff's health condition played a role, in any way, in Verizon's criticism of Plaintiff's performance and subsequent decision to terminate his employment.  While Plaintiff is sure to argue that his termination came within weeks of his unsolicited disclosure that he suffered from multiple sclerosis, "temporal proximity, standing alone, is not sufficient evidence of pretext."  Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 317 (6th Cir. 2001); accord, Nelson v. J.C. Penney Co., Inc., 75 F.3d 343, 346-47 (8th Cir. 1996) (; Anderson v. Coors Brewing Co., 181 F.3d 1171, 1180 (10th Cir. 1999).

Since there is a "complete failure of proof concerning an essential element" of Plaintiff's disparate treatment claim -- he cannot establish discriminatory motive -- Verizon is entitled to a judgment as a matter of law.  Celotex, 477 U.S. at 322.

### III.    <u>CONCLUSION</u>

The Court should grant Verizon's motion for summary judgment and dismiss with

prejudice Plaintiff's First Amended Complaint in its entirety.

March 13, 2003                                    Respectfully submitted,


_____/s/_____
James S. Urban (admitted *pro hac vice*)
Pa. I.D. #82019
Todd C. Duffield (admitted *pro hac vice*)
Pa. I.D. #84041
John E. Iole, *Associate Counsel*
Pa. I.D. #47768

Jones Day
One Mellon Center
500 Grant Street, Suite 3100
Pittsburgh, PA  15219
Tel:  412-391-3939
Fax: 412-394-7059

Attorneys for Defendants Bell Atlantic
Corporation, Bell Atlantic Network Services,
Inc. Verizon Communications Inc. and Verizon
Services Corp.

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing **Defendants' Memorandum of Law in Support of Motion for Summary Judgment** was served this day upon counsel for Plaintiff via first-class, U.S. Mail, postage prepaid, at the following address:

>Andrew S. Abramson, Esq.
>LAW OFFICES OF ANDREW S. ABRAMSON
>The Pavilion
>261 Old York Road, Suite 511
>P.O. Box 724
>Jenkintown, PA  19046

Dated:  March 13, 2003             _____/s/_____

                                   James S. Urban