**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LOUIS YUDKOVITZ,** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **BELL ATLANTIC** | : | |
| **CORPORATION, et al.** | : | **NO. 02-CV-3029** |

**<u>MEMORANDUM ORDER</u>**

Presently before this Court is Defendants Bell Atlantic Corporation, Bell Atlantic

Network Services, Inc., Verizon Communications Inc. and Verizon Services Corp.'s

(collectively, "Verizon") Motion to for Summary Judgment (Dkt. No. 19).  For the reasons

discussed below, Defendants' Motion is **GRANTED**.

I. Factual Background

A. Yudkovitz's Medical Condition

Plaintiff Louis Yudkovitz ("Yudkovitz") suffers from relapsing-remitting multiple

sclerosis ("MS").  Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for

Summary Judgment ("Pl.'s Mem."), Ex. E at 102-03 (Dkt. No. 21).  His exacerbation frequency

appears to be approximately once per year and each exacerbation lasts from one week to a month.

When he experiences a "flare-up," Yudkovitz gets dizzy, loses control over his left side and has

difficulty climbing steps.  <u>Id.</u> at 104.  He also has "to be careful about getting around with [his]

left leg," <u>Id.</u>, and cannot carry "heavy objects" in his left hand.  Compl. ¶ 47.  When his MS is in

remission, Yudkovitz still experiences problems in his left leg and left arm.  Pl.'s Mem., Ex. E at

474.  As a result, Yudkovitz walks slower, has difficulty climbing steps, lacks the mobility he

had in his youth, and is unable to lift or move things around the house.  <u>Id.</u> at 474-75.

Yudkovitz, however, does not have a problem walking around the house or on a flat surface.  Id.

at 109.  Outdoors, Yudkovitz is able to walk, but is careful not to trip over uneven pavement.  Id.

To date though, Yudkovitz has never fallen while walking.  Id. at 110-11.  Further, when

working for Verizon, Yudkovitz's MS never affected his job performance.  Id. at 196; Defs.'

Brief in Support of Its Motion for Summary Judgment ("Defs.' Br."), Ex. C at 2.

B. Yudkovitz's Tenure with Verizon

In March 1999, Yudkovitz sought employment through a recruiting firm, Romac

International ("Romac").  Pl.'s Mem., Ex. E at 136-37.  Romac arranged a job interview with

Verizon for a position in its Order Management Department.  Id. at 140-41; Pl.'s Mem., Ex. J at

12.  Yudkovitz interviewed with Elizabeth Cass-Schmidt, Senior Manager in Verizon's Order

Management Department, and Kathy Buttil, Verizon's Hiring Manager.  Pl.'s Mem., Ex J at 6-8.

Yudkovitz presented himself as an experienced project manager who had worked for 22 different

companies over 31 years.  Defs.' Br., Ex. A; Pl.'s Mem., Ex. J at 13; Pl.'s Mem., Ex. E at 147.

Yudkovitz, however, did not disclose during the interview that he had MS.  Id. at 15; Pl.'s Mem.,

Ex. E at 146, 361-62.

On June 1, 1999, Verizon hired Yudkovitz over five other candidates as a

Software Manager, Level III in the Release Management Department.  Id. at 15-16; Pl.'s Mem.,

Ex. E at 252-53; Pl.'s Mem., Ex. H at 16; Pl.'s Mem., Ex. J at 13; Pl.'s Mem., Ex. E at 147.  As a

Software Engineer Level III, Yudkovitz was expected "to come in the door and be, in a very, very

quick period of time, if not immediately, very, very productive."  Pl.'s Mem., Ex. J at 16, 45-46.

About three months into the job, Plaintiff was assigned the task of recording

minutes at weekly department meetings and distributing them to his co-workers before the next

2

meeting. Pl.'s Mem., Ex. E at 266. On several occasions, Yudkovitz was unable to generate

meeting minutes in a timely fashion. Id. at 268. Plaintiff was also assigned the task of making

an oral presentation on production support to a group of managers, including Ms. Cass-Schmidt.

Id. at 277. According to Ms. Cass-Schmidt, Plaintiff's presentation was incomplete, factually

incorrect and poorly organized. Pl.'s Mem., Ex. J at 36-37. Rosemary Brown, who became

Yudkovitz's supervisor in October 1999, also attended the presentation and concluded that

Yudkovitz had organizational deficiencies and lacked strong presentation skills. Pl.'s Mem., Ex.

H at 29-30. Neither Ms. Cass-Schmidt nor Ms. Brown knew, at the time, that Yudkovitz

suffered from MS. Pl.'s Mem., Ex. E at 283-84.

   On November 11, 1999, Yudkovitz was hospitalized after suffering a relapse

while walking through a shopping mall. Id. at 204-05. The following day, Yudkovitz called his

then-immediate supervisor, Ms. Brown to inform her that he would be out sick because his

"neurological disorder ha[d] flared up." Id. at 207. In response, Ms. Brown instructed

Yudkovitz to contact CORE Inc. ("CORE"), an independent third-party company that provides

Verizon with employee disability management. Id. at 208-09; Pl.'s Mem., Ex. H at 33-34.

Yudkovitz called CORE "continuously" and "kept them informed" during his absence. Id. at

209. CORE notified Verizon that Yudkovitz qualified for short-term disability, but it did not

share with Verizon any information about the nature of Yudkovitz's condition. Defendants'

Reply Brief in Support of Its Motion for Summary Judgment ("Defs.' Reply Br."), Ex. A ¶¶ 2-9;

Pl.'s Mem., Ex. H at 32. Yudkovitz also called Ms. Brown on several occasions to update her as

to his status. Pl.'s Mem., Ex. E at 211. During those calls, Yudkovitz described his symptoms to

Ms. Brown, saying he felt weak and dizzy. Id. at 212. Yudkovitz did not, however, disclose that

he suffered from multiple sclerosis.  Id. at 214.

Prior to Yudkovitz's November 1999 hospitalization, Ms. Brown noticed he walked with a "slight limp."  Pl.'s Mem., Ex. H at 33.  Ms. Brown recalls discussing Yudkovitz's limp with her predecessor, Michael DiTomasso, because they thought he "had a problem with his knee or his ankle."  Id.  Ms. Brown also may have noticed Yudkovitz using a quad-based cane.[1] Id. at 36.

Ms. Brown continued to supervise Yudkovitz after he returned to work in December 1999, and during the course of her supervision, developed a number of concerns regarding Yudkovitz's performance.  Ms. Brown believed that "he had not shown an understanding of the applications and processes within [the] organization."  She was also "concerned about the accuracy and timeliness of documents that [Yudkovitz] submitted[, . . .] about his lack of PC skills and use of management tools[, . . . ] about his inability to react to feedback[, and] the quantity of assignments that he could take on."  Pl.'s Mem., Ex. H at 48.  As a result, in March 2000, Ms. Brown drafted her review of Yudkovitz and rated his performance as unsatisfactory.[2]  Defs.' Br., Ex. F.  Ms. Cass-Schmidt reviewed a draft of Ms. Brown's review of Yudkovitz and agreed with Ms. Brown's assessment of his performance.  Pl.'s Mem., Ex. H at 67; Pl.'s Mem., Ex. J at 43, 49.

Because Yudkovitz's performance was rated as unsatisfactory, he was placed on a

---

[1]    Ms. Brown and Ms. Cass-Schmidt noticed Yudkovitz using a quad-based cane subsequent to his November 1999 hospitalization.  Pl.'s Mem., Ex. H at 36; Pl.'s Mem., Ex. J at 23.

[2]    Verizon annually evaluates its employees during the first three months of a calendar year.

4

Management Performance Improvement Plan (the "MPIP"),[3] Pl.'s Mem., Ex. J at 43, 49, a written copy of which was given and explained to Yudkovitz on March 13, 2000.  Defs.' Br., Ex. G.  The MPIP notified Yudkovitz that a failure to rectify his performance deficiencies "could result in discipline up to and including dismissal."  Id.

Pursuant to the MPIP, Yudkovitz was required to satisfactorily complete two assignments by the end of March 2000, and pursue some computer training.  Id.  With respect to the two assignments, Yudkovitz completed them only after receiving from Ms. Brown a great deal of guidance.  Pl.'s Mem., Ex. H at 67-69, 79; Pl.'s Mem., Ex. E at 312.  Ms. Brown noticed "some improvement, although [Yudkovitz] was not to the level where [she] thought he should be."  As for the computer training, Yudkovitz completed Microsoft Excel training and took a Lotus Notes class via the internet.  Pl.'s Mem., Ex. H at 76.

Although Yudkovitz struggled with the two assignments, Ms. Brown decided to extend the MPIP because "she wanted to see if there were other tasks [Yudkovitz] would perform better."  Id. at 76.  Ms. Brown drafted the extended Management Performance Improvement Plan (the "EMPIP") on April 11, 2000.  Defs.' Br., Ex. H; Pl.'s Mem., Ex. H at 78.

On April 18, 2000,  Yudkovitz asked Ms. Brown if there would be any consequences if he missed any more time from work.  Pl.'s Mem., Ex. E at 313-14.  Ms. Brown told Yudkovitz that it would probably cost him his job.  Id. at 314.  Yudkovitz, in response, disclosed for the first time that he had MS.  Id. at 214, 301; Pl.'s Mem., Ex. H at 37-38; Pl.'s

---

[3]     Any Verizon employee whose performance is rated below satisfactory level is placed on a Management Performance Improvement Plan, which is a structured plan to help improve their performance.  Pl.'s Br., Ex. E at 407-08; Pl.'s Br., Ex. J at 49.

Mem., Ex. J at 51-52.

On the same day, Ms. Brown provided Plaintiff with a copy of the EMPIP, which consisted of three additional assignments to be completed by the end of April 2000. Defs.' Br., Ex. H; Pl.'s Mem., Ex. H at 78-79. Yudkovitz performed the first assignment unsatisfactorily, showed improvement in completing the second, although he required significant feedback to get it correct, and completed the third, despite initially looking at the wrong set of documents. Pl.'s Mem., Ex. H at 77-78.

On or about April 27, 2000, because of Yudkovitz's performance on the MPIP, Ms. Brown recommended to Ms. Cass-Schmidt that Verizon terminate Yudkovitz's employment. Pl.'s Mem., Ex. H at 90.

On May 1, 2000, Yudkovitz suffered another relapse while at home. Pl.'s Mem., Ex. E at 440-41. His symptoms were an "[i]nability to move around, difficulty walking [and] balance off." Id. at 441. On May 8, 2000, three days after he returned to work, Yudkovitz was notified that his employment was terminated for performance reasons. Id. at 442-43; Pl.'s Mem., Ex. H at 91-92.

C. Yudokovitz's Requests to Telecommute

In July 1999, Yudkovitz asked his then-immediate supervisor, Mr. DiTomasso, if he could work from home. Pl.'s Mem., Ex. E at 284-86. Mr. DiTomasso responded that he did not know how an employee could arrange to work from home. Id. After raising the issue with another manager, Mary Kivlin, in October 1999, Yudkovitz approached Ms. Cass-Schmidt and requested that he be permitted to work from home. Id. at 286-87; Pl.'s Mem., Ex. J at 25. Yudkovitz wanted to work from home because his "wife had to drive [him] into work and then

pick [him] up" and it was difficult for Yudkovitz to commute to and from the train station. Pl.'s

Mem., Ex. E at 222, 427-28. In furtherance of his desire to work from home, Yudkovitz filled

out and submitted to Ms. Cass-Schmidt a Telecommuting Commitment form, in which

Yudkovitz wrote, among other things, that working from home would provide him with "instant

communications without the need for public transportation." Id. at 229-34; Defs.' Br., Ex. I.

Yudkovitz made no mention of his health issues. Ms. Cass-Schmidt signed the Telecommuting

Commitment form, approving Yudkovitz's request for at-home computer access so that he could

telecommute during off-hours shifts. Id. at 230-34, 238, 296-97; Defs.' Br., Ex. I; Pl.'s Mem.,

Ex. J at 25-26.

       Following his November 1999 hospitalization, Yudkovitz once again asked Ms.

Cass-Schmidt if he could work from home during off-hour shifts. Id. at 220-21. The reason

Yudkovitz gave for wanting to work from home was his "neurological disorder." Id. at 323. Ms.

Cass-Schmidt said that she would try to move Yudkovitz's request along. Id.

       In March 2000, a Verizon technician appeared at Yudkovitz's home to install an

extra telephone line and set up his computer for at-home access. Id. at 223-24. Thereafter,

Yudkovitz asked Ms. Brown for assistance in connecting his personal computer to Verizon's

network. Id. at 224-26. Ms. Brown allowed Yudkovitz and one of his colleagues, Tim

Monaghan, to leave work early, proceed to Yudkovitz's home, and attempt to link Yudkovitz's

personal computer with Verizon's network. Id. Mr. Monaghan was unable to link Yudkovitz's

personal computer with Verizon's network because Yudkovitz's personal computer did not have

sufficient memory to run the software necessary to telecommute. Id. at 225. In the end,

Yudkovitz never successfully established a link with Verizon's network. Id. at 299.

## II. Procedural History

Following his termination, Yudkovitz filed a charge of disability discrimination with the Equal Employment Opportunity Commission (the "EEOC")[4] and the Pennsylvania Human Relations Commission (the "PHRC"). After receiving a right to sue letter from the EEOC, Pl.'s Mem., Ex. C, Yudkovitz filed suit against Verizon alleging disability discrimination in violation of the Americans with Disabilities Act (the "ADA" or the "Act") (Count I) and failure to pay wages in violation of the Pennsylvania Wage Payment and Collection Law (Count II). (Dkt. No. 1). Yudkovitz later amended his complaint to add an additional Count alleging disability discrimination in violation of the Pennsylvania Human Relations Act (Count III) after receiving notification from the PHRC that his case had been closed administratively. (Dkt. No. 14). On March 12, 2003, the parties jointly filed a Stipulation to dismiss with prejudice Count II. (Dkt. No. 20). As a result, the only claims that remain before the Court are Counts I and III.

Verizon now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. With respect to Yudkovitz's claim that Verizon failed to accommodate his alleged disability by refusing to allow Yudkovitz to work from home, Verizon argues that: (1) he did not have a covered disability; (2) Yudkovitz never requested an accommodation for any disability; and (3) Yudkovitz never requested any reasonable accommodation. Defs.' Br. 1. As for Yudkovitz's claim that Verizon discriminated against him on the basis of his alleged disability when it terminated his employment, Verizon argues that: (1) he was not "disabled;"

---

[4]    EEOC determinations should not be considered in deciding a motion for summary judgment. See Stewart v. Personnel Pool of Am., Inc., Civ. A. No., 9202581, 1993 WL 525575, at *6 (D.N.J. Dec. 16, 1993) (citing Williams v. Borough of W. Chester, 891 F.2d 458, 458 (3d Cir. 1989)).

and (2) Yudkovitz cannot adduce evidence that Verizon's reasons for terminating his employment were a pretext for discrimination.  Id.  Yudkovitz responds that he has an ADA-covered disability, Verizon denied his request to telecommute, which is a reasonable accommodation under the ADA, and a reasonable jury could find that Verizon's reasons for terminating his employment were a pretext for discrimination.  Pl.'s Mem. 17-28.

### III. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505 (1986).  In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994).  The moving party bears the burden of showing that the record discloses no genuine issues as to any material fact and that he or she is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608 (1970).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings to set forth specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86, 106 S.Ct. 1348 (1986).  There is a genuine issue for trial "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 249.  "Such affirmative evidence – regardless of whether it is direct or circumstantial - must amount to more than a scintilla, but may amount to less (in the evaluation

of the court) than a preponderance." Williams, 891 F.2d at 460-61.

IV. Analysis

A. Disability Claims

The ADA requires employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). A "qualified individual with a disability" is defined as "an individual with a disability, who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12118(8).

"In order to make out a prima facie case under the ADA, a plaintiff must be able to establish that he or she (1) has a 'disability' (2) is a 'qualified individual' and (3) has suffered an adverse employment action because of that disability." Deane v. Pocono Med. Ctr., No. Civ. A. 96-7174, 1998 WL 173100, at *3 (3d Cir. Apr. 15, 1998) (citing Gaul v. Lucent Techs. Inc., 134 F.3d 576, 580 (3d Cir. 1998)). The Act defines a "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

1. Substantially Limited in a Major Life Activity

To qualify as disabled under subsection (A) of the ADA, Yudkovitz must demonstrate that (1) he has a physical or mental impairment (2) that the impairment limits a major life activity and (3) that the limitation on the major life activity is substantial. It is

10

undisputed that MS qualifies as a physical impairment under 45 C.F.R. § 84.3(j)(2)(I)[5] and that

walking and lifting are major life activities.[6]  Thus, the relevant question is whether Yudkovitz

has shown that his MS *substantially* limits his ability to walk or lift.

        The EEOC regulations provide that an individual is substantially limited in a

major life activity if he is "[u]nable to perform a major life activity that the average person in the

general population can perform" or is "[s]ignificantly restricted as to the condition, manner or

duration under which [he or she] can perform a particular major life activity as compared to the

condition, manner, or duration under which the average person in the general population can

perform that same major life activity."  29 C.F.R. § 1630.2(j).  In determining whether an

impairment substantially limits a major life activity, the regulations instruct courts to consider the

following factors:  "[t]he nature and severity of the impairment; [t]he duration or expected

---

[5]     A physical or mental impairment is:

> (A) any physiological disorder or condition, cosmetic
> disfigurement, or anatomical loss affecting one or
> more of the following body systems: neurological;
> musculoskeletal; special sense organs; respiratory,
> including speech organs; cardiovascular; reproductive;
> digestive; genito-urinal; hemic and lymphatic; skin;
> and endocrine; or (B) any mental or physiological
> disorder, such as mental retardation, organic brain
> syndrome, emotional or mental illness, and specific
> learning disabilities.

45 C.F.R. § 84.3(j)(2)(I).

[6]     Major life activities include "caring for oneself, performing manual tasks,
walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R.
§ 1630.2(I) (1997).  More specifically, "'[m]ajor life activities' are those basic
activities that the average person in the general population can perform with little
or no difficulty . . . includ[ing] siting, standing, lifting, [and] reaching."  29 C.F.R.
Pt. 1630, App. § 1630.2(I).

11

duration of the impairment; and [t]he permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment."  29 C.F.R. § 1630.2(j)(2).

Yudkovitz alleges that "MS greatly affects the left side of his body in general and greatly restricts his left leg, causing [him] to have trouble with his balance, great difficulty in walking and prevents him from carrying heavy objects."  Compl. ¶ 47.  When asked during his deposition about his limitations, Yudkovitz stated that he walks slower, has difficulty climbing steps, uses a quad-based cane as needed,[7] and is unable to carry things in his left hand.  Pl.'s Br., Ex. E at 104, 474-75.  Yudkovitz also submitted office notes from his treating physician, David S. Roby, M.D., in which Dr. Roby stated that Yudkovitz experiences left-sided weakness, fatigue and an altered gait.  Pl.'s Br., Ex. G.

Yudkovitz, however, presented no evidence that the restriction on his ability to walk is more than moderate.  Like the plaintiff in Kelly v. Drexel Univ., Yudkovitz is still physically capable of walking and climbing stairs.  94 F.3d 102, 106 (3d Cir. 1996).  Yudkovitz also failed to offer any guidance as to the limitations on his lifting other than an inability to carry "heavy objects."[8]  Compl. ¶ 47.  Moderate restrictions on the ability to walk do not amount to a substantial limitation.  See Kelly, 94 F.3d at 106 (Plaintiff's inability to walk "'more than a mile or so'" and his difficulty climbing stairs do not constitute a substantial limitation in his ability to

---

[7]    Although Yudkovitz claims that he has had to "constantly" use a quad-based cane since his November 1999 hospitalization, Dr. Roby noted in February 2001 that Yudkovitz uses a quad-based cane "as needed," and in June 2001, that Yudkovitz "is now walking without an assistive device."  Pl.'s Br., Ex. G.

[8]    Yudkovitz stated during his deposition that he cannot carry things in his left hand during a relapse and, when his MS is in remission, he can only "just lift so much." Pl.'s Mem., Ex. E at 104, 193.

walk.); <u>Talk v. Delta Airlines, Inc.</u>, 165 F.3d 1021, 1025 (5th Cir. 1999) (holding that limping, "mov[ing] at a significantly slower pace than the average person," and difficulty walking in extreme cold do not constitute a substantial impairment); <u>Penny v. United Parcel Serv.</u>, 128 F.3d 408, 415 (6th Cir. 1997) ("Moderate difficulty or pain experienced while walking does not rise to the level of a disability."); <u>see also</u> 29 C.F.R. Pt. 1630, App. § 1630.2(j) (An individual's walking is substantially limited if he or she "can only walk for very brief periods of time.").  Nor does the inability to lift heavy objects constitute a substantial limitation.  See <u>Marinelli v. City of Erie</u>, 216 F.3d 354, 363-64 (3d Cir. 2000) (Plaintiff's inability to lift more than ten pounds did not constitute a substantial limitation on the major life activity of lifting.); <u>Gillen v. Fallon Ambulance Serv., Inc.</u>, 283 F.3d 11, 21 (1st Cir. 2002) (The "inability to lift heavy objects does not constitute a substantial limitation on a person's overall ability to lift [as the] capacity to perform heavy lifting is not a trait shared by the majority of the population."); <u>McCoy v. USF Dugan, Inc.</u>, No. 01-3189, 2002 WL 1435908, at *2-*3 (10th Cir. Jul 3, 2002) (holding that plaintiff was not substantially limited in the major life activity of lifting because she was unable to lift more than twenty pounds); <u>Thompson v. Holy Family Hosp.</u>, 121 F.3d 537, 539-40 (9th Cir. 1997) (finding plaintiff's twenty-five pound lifting restriction not substantially limiting). Therefore, the Court, although sympathetic towards Yudkovitz's condition, is satisfied that it does not substantially limit him in the relevant major life activities of walking and lifting.

### 2. Record of Impairment

Next, Yudkovitz asserts that he is disabled by virtue of a record of impairment. Compl. ¶ 46.  To maintain his claim based on a record of impairment, Yudkovitz must show that he had an impairment which substantially limited a major life activity.  See <u>Olson v. Gen. Elec.</u>

Astrospace, 101 F.3d 947, 953 (3d Cir. 1996) (regarding the plaintiff's record of impairment

claim, the court stated that it was absolutely necessary for him to demonstrate that the

impairment limited one or more of his major life activities); Kresge v. Circuitek, 958 F. Supp.

223, 225 (E.D. Pa. 1997) ("[P]laintiff's impairment must be substantially limiting in order for his

past records to be a 'record of such impairment.'").  As noted above, Yudkovitz's MS does not

substantially limit his major life activities of walking or lifting.  Therefore, Yudkovitz does not

qualify as disabled under subsection (B) of the ADA.  42 U.S.C. § 12102(2)(B).

### 3. Regarded as Disabled

            Finally, Yudkovitz claims that he is disabled because Verizon regarded him as

having a disability.  Compl. ¶ 46.  An individual is regarded as disabled within the meaning of

the ADA if "(1) a covered entity mistakenly believes that a person has a physical impairment that

substantially limits one or more major life activities, or (2) a covered entity mistakenly believes

that the person's actual, nonlimiting impairment substantially limits one or more major life

activities."  Sutton v. United Airlines, Inc., 527 U.S. 471, 489, 119 S.Ct. 2139, 2149-50 (1999).

The mere fact that an employer is aware of an employee's impairment, however, does not

demonstrate that the employer regarded the employee as disabled.  See Kelly, 94 F.3d at 109

(noting that the district court properly rejected plaintiff's argument that he was "regarded as

disabled" because his "limp was 'visible and apparent' and his supervisor was aware of his

impairment).  That Verizon noticed Yudkovitz walked with a "slight limp" or knew of his

physical impairment does not demonstrate that it perceived Yudkovitz as being disabled.  " Pl.'s

Mem., Ex. H. at 33; Pl.'s Mem., Ex. E at 207, 212, 214.  Accordingly, we conclude that

Yudkovitz has not established that he is disabled under subsection (C) of the ADA.  42 U.S.C.

§ 12102(2)(C).

In sum, we find that Yudkovitz is not disabled within the meaning of the ADA.

B. Discrimination Claims

1. ADA Claim

In order to establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate that: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000) (quoting Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998). Because Yudkovitz is not disabled within the meaning of the ADA, he cannot establish a prime facie case of discrimination under the Act. Even if a prime facie case of discrimination could be established, Yudkovitz's claim fails because he has not carried his burden of persuasion under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973).

The Third Circuit applies the McDonnell Douglas burden-shifting framework to ADA discrimination claims. See Shaner, 204 F.3d at 500. The McDonnell Douglas analysis proceeds in three stages:

> First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Finally, should the defendant carry this burden, the plaintiff then must have the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not

15

its true reasons, but were a pretext for discrimination.

Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).

Here, Verizon has articulated a legitimate, nondiscriminatory reason for terminating Yudkovitz's employment, namely, substandard performance.  Having done so, the burden shifts to Yudkovitz to present sufficient evidence from which a jury could conclude that Verizon's purported reason for terminating his employment was in actuality a pretext for intentional disability discrimination.  See Shaner, 204 F.3d at 501 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752 (1993)).  Specifically, Yudkovitz must point "'to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  Id. (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) and Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1067 (3d Cir. 1996)).  Yudkovitz, however, has failed to do so here.

Yudkovitz presented himself as an experienced project manager who could be expected to hit the ground running.  Instead, he struggled, missing deadlines and making poor oral presentations.  Yudkovitz's managers found that he lacked necessary computer skills, produced inaccurate documents, did not respond to feedback and was unable to handle multiple assignments at one time.  As a result, Yudkovitz received a performance review of unsatisfactory and, accordingly, was placed on a performance improvement plan.  Although Yudkovitz continued to struggle, his supervisor extended the plan, giving him every opportunity to display any skills.  But when Yudkovitz failed to show significant improvement, Verizon terminated his

16

employment for performance reasons.

There is nothing in the record to suggest that Yudkovitz's condition played any role in Verizon's criticism of his performance or its decision to terminate his employment. To the contrary, the record demonstrates that Yudkovitz's managers perceived his work to be deficient and were critical of Yudkovitz's performance beginning at least nine months before his termination. Further, they communicated their concerns to Yudkovitz long before they knew he had MS. Indeed, Yudkovitz did not disclose to his managers that he had MS until April 18, 2000, more than one month after he was placed on a performance improvement plan. That Yudkovitz's termination came within weeks of his disclosure, standing alone, is not sufficient evidence of pretext. See Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 317 (6th Cir. 2001); accord Nelson v. J.C. Penney, Inc., 75 F.3d 343, 346-47 (8th Cir. 1996); Anderson v. Coors Brewing Co., 181 F.3d 1171, 1180 (10th Cir. 1999). Thus, even if Yudkovitz could establish a prime facie case of discrimination under the Act, which he cannot, he has not presented sufficient evidence to permit the trier of fact either to disbelieve Verizon's reasons, or to conclude that disability discrimination was the real reason for Verizon's adverse employment actions.

2. PHRA Claim

Courts "generally interpret the PHRA in accord with its federal counterparts." Kelly, 94 F.3d at 105 (citations omitted). "[A]ny analysis applied to the ADA claim applies equally to the PHRA claim." Matczack v. Frankford Candy and Chocolate Co., 136 F.3d 933, 935 n.1 (3d Cir. 1997) (citing Kelly, 94 F.3d at 105). Therefore, this Court finds that Yudkovitz has failed to establish discrimination under the PHRA.

17

V. Conclusion

Accordingly, Verizon's motion is granted.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LOUIS YUDKOVITZ,** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| v. | : | |
| | : | |
| **BELL ATLANTIC** | : | |
| **CORPORATION, et al.** | : | **NO. 02-CV-3029** |

## ORDER

AND NOW, this        day of January, 2004, upon consideration Defendants Bell

Atlantic Corporation, Bell Atlantic Network Services, Inc., Verizon Communications Inc. and

Verizon Services Corp.'s  Motion to for Summary Judgment (Dkt. No. 19), and Plaintiff Louis

Yudkovitz's response thereto, it is hereby ORDERED that Defendants' Motion is **GRANTED**.

The Clerk is directed to statistically close this matter.

**BY THE COURT:**

_____
**LEGROME D. DAVIS, J.**

19